Good morning, Your Honors. May it please the Court, I'm Elizabeth Thelmuth for the Appellant Ameriprise Financial Services and I respectfully reserve two minutes for rebuttal. All right. Upon further review of the underlying briefs and in determining and reviewing the Court's order from earlier this week, dated October 6, we believe there are now only two single issues before the Court today. The first issue is whether the District Court had subject matter jurisdiction pursuant to 28 U.S.C. 1332a and whether the underlying pleading sufficiently alleged diversity of citizenship and the required jurisdictional amount in controversy. What I understand by way of the Court's October 6 order is that the Court is suggesting that it does not have jurisdiction to even address this appeal or alternatively the Court is trying to determine whether Mr. Marshall must amend his pleading to assert proper subject matter jurisdiction. Now the complaint only makes a blatant statement that there is subject matter jurisdiction under 28 U.S.C. 1332a but it does not set forth any specific facts regarding the citizenship of both parties nor whether the plaintiff can meet the minimum jurisdictional amount that's in controversy here. We believe that Mr. Marshall will be able to amend properly to establish diverse citizenship but we are unsure whether he will be able to meet the amount in controversy thresholds and we believe this requires further proceedings at the District Court level. It is unclear based on the record, the complaint, and particularly the District Court's ruling on the motion to compel arbitration whether Mr. Marshall's claims total $75,000. Just a point. Is your position a limited remand for the District Court to determine a diversity jurisdiction? We are also asking a remand, Your Honor, for there to be an evidentiary hearing on the fiduciary issue and the scope of that fiduciary duty that existed between Mr. Marshall and Mr. Ghentafari. Did you ask for an evidentiary hearing the first time around? The evidentiary hearing we did not, Your Honor. However, that being said, the record indicates that there was a discussion amongst the Court about the lack of evidence given the fact that Mr. Ghentafari has since deceased and we believe that it was an abuse of discretion by the trial court to not allow for an evidentiary hearing to occur and take place. How is it an abuse of discretion if you didn't ask for it? Well, Your Honor... And you're implying the court responded to a motion and abused its discretion. So what you're arguing is there's a sua sponte duty to have a hearing and what's your authority for that? Yes, there was a sua sponte obligation by the District Court to... And what case is that? We don't have a direct case on point, Your Honor, but the Ashburn case is somewhat on point and suggests that an evidentiary hearing, when there are particular factual issues, which there were in this case, given the fact that there was such a limited amount of evidence available to Ameriprise, that the court should have made that determination sua sponte that an evidentiary hearing was necessary. So tell me what you would do at an evidentiary hearing since your primary witness is deceased and unavailable? Well, we needed to have the opportunity, Your Honor, in order to cross-examine Mr. Marshall to determine his credibility. In this instance, the fiduciary relationship that existed between Mr. Marshall and Mr. Ganzenfari, it's a unique relationship considering the fact that Mr. Marshall is alleging that he's a vulnerable adult because he suffers from dyslexia. Now, the District Court erred in not allowing us to further cross-examine and determine whether or not Mr. Marshall, number one, was credible, and number two... And where did you ask for that? We did not ask for the ability to cross-examine. So when you say he erred when he didn't allow us to, you didn't ask, so he wasn't presented with that decision, right? That's correct, Your Honor, but we believe that it was an abuse of discretion by the District Court. There's no authority for that. When you don't ask for something, it's generally waived to the extent you had that right. So let's work with the record that we have. Understood, Your Honor. I want to just touch briefly back to the subject matter jurisdiction issue because we, again, we believe that the record is somewhat incomplete and that it is necessary for Mr. Marshall to amend his pleading in order to establish whether or not he can meet the $75,000 threshold. What's relevant here is that the court ruled that all claims relating to the trust belong in arbitration, and in 2017, when the trust was created, the annuities that are at issue moved into that trust. So the issue now is what claims remain still to Mr. Marshall and whether or not those claims can meet the jurisdictional threshold of $75,000. In this regard, the issues pertaining to arbitrability and the amount that's actually in controversy are so intertwined that remand to the District Court would be appropriate for further proceedings. Right. Can you tackle the record that we have on the fiduciary relationship and the vulnerability that Marshall is claiming? Yes, Your Honor. So with respect to the vulnerability, Mr. Marshall, and what's clearly set forth in the record, is that he is a college-educated individual. He had a highly successful career as an insurance broker for nearly 20-plus years. He alleges that he has a dyslexia diagnosis, and the sole document that he relies upon in establishing that diagnosis is a letter that is dated from the late 1980s from the University of Cal State Berkeley. And we do not know, based on that letter in and of itself, whether or not he put in a declaration, right? He attached it to his declaration as an exhibit, correct? Right. So that's evidence that the District Court is considering, saying that he has a 20-year fiduciary relationship, right? A 20-year fiduciary relationship with this advisor, and he informed the advisor from the very beginning that he has trouble reading and would be relying on the advisor to alert him to any important provisions. And then periodically, he would remind the advisor every time documents came up that he has this issue with reading. So why isn't that enough to support the District Court's findings? Well, it's not enough to support the District Court's findings, Your Honor, because as the concurring opinion held in Brown, in the instances where fiduciary duty is raised to a heightened standard, where there is this obligation to disclose the context of an arbitration provision to a client, it's very limited in certain situations where there's a vulnerable adult and where there's trust and confidence that's being created by way of the relationship. Here, there's nothing in the case that Mr. Marshall did not have the ability to discover the terms of the contract. All that his disability diagnosis, this dyslexia allegation, indicates is that- But that's where the trust comes from, right? You hire an advisor, you tell the advisor, I'm going to rely on you to tell me if there's anything important because I have trouble reading and digesting the information. Then periodically throughout an extensive two-decade long relationship, you periodically remind the advisor of that. That's not a trusting relationship? The trusting relationship, not necessarily from our perspective, Your Honor, no, because the issue here is whether or not he could have had the ability to discover the underlying terms of the contract. And the record is clear that he didn't have an inability to read, it's just that it was going to take him more time. In fact, if you go through the declaration, he makes representations that it would have been, quote unquote, exhausting for him to read. And that's directly in contrast with the cases like Ashburn and Brown, where the plaintiffs in those cases testified to points that the advisors were trying to rush them through the execution of the contracts. There's nothing in the declaration indicating that Mr. Marshall was being rushed to execute these contracts. There's nothing indicating that he wasn't provided an opportunity to take the contract home and review it and go through it himself thoroughly. All that is indicated in the record is that it would have taken him more time to read, not that he could not read, not that he could not understand what the terms of the contract said. And that's directly in comparison to the facts of Brown, where in that case the plaintiff was elderly and blind, and therefore did not have the ability to discover what the underlying contract said. Or similarly in Lynch, where there the plaintiff only had a ninth grade education, less than a high school degree, and arguably he probably didn't even have the mental capacity to even understand what the word arbitration even meant, which is unlike the plaintiff in this case, Mr. Marshall. He is a seasoned and highly successful insurance broker, and while he might have had, you know, some challenges in the time amount that it took him to read something, that does not necessarily mean that he could not read, and that does not necessarily mean that he did not have the ability to understand. And that's what's crucial, because an essential element of fraud in the execution, a defense to that claim, is that if the plaintiff has the ability to actually discover what the contract states, and that's from the holding of then there is no fraud in the execution. And here, there is nothing indicating that Mr. Marshall could not have done that. And that's also, if we're going to look to the Ashburn case, which I anticipate Ms. Stewart will bring up, the issue there was that whether or not the plaintiffs were actually provided a copy of the arbitration agreement. There's nothing within the declaration or this record indicating that Mr. Marshall was never provided a copy of the agreements. Just that he actually had a copy of them, just that he had and needed additional more time to be able to review them. And this is exactly why having an evidentiary hearing would have been necessary, because we needed to have an opportunity to cross-examine Mr. Marshall and determine the extent of this disability. We also needed to know whether or not the challenges he experienced in college, based on this letter he relied upon, whether they were still applicable when he was even an Ameriprise client. Dyslexia is an interesting diagnosis. It's a reading challenge. It doesn't necessarily mean that you can read. It's a hurdle that arguably could improve over time. So we also needed an opportunity to ask him about that. And all of these various factual issues, they must be resolved at the district court. Just going back to your Honor asked a question about the trust component, and we believe also that the trial court erred in treating this mere existence of a fiduciary duty and the relationship that existed prior to the 2010 time period was able to be imputed upon Ameriprise. There's not enough information in comparison to the cases like Brown, where there was this relationship that existed previously that related to having meetings or managing assets, review of financial account statements. There's nothing in the record indicating that that level of a relationship was established before these contracts were executed. And I just want to make one final point for the court, because the issue of the abuse of discretion did come up previously by your Honor, and the court in Ashburn made clear that failure to exercise as discretion conferred and compelled by law constitutes a denial of a fair hearing, deprivation of fundamental procedural rights, and an abuse of discretion. And for those reasons, we respectfully request that the court remand. And I'll reserve the remainder of my time. Thank you. Thank you, counsel. Thank you, Your Honor. My name is Melinda Stewart, and I represent the respondent, John Marshall. First, with respect to federal court jurisdiction, the complaint alleges in paragraphs 1, 2, and 3, respectively, that plaintiff John Marshall was a resident of California, that John Marshall Irrevocable Trust is a California trust with its principal place of business in California, and Ameriprise is a foreign corporation. The complaint also alleges losses and damages on investments which totaled $797,000 that were made between 2009 and 2012. We did allege damages in the sum according to proof. It is true we did not say in the sum according to proof that's in excess of $75,000. I think it could be reasonably inferred that when the investments at issue were $797,000, we're going to be talking about more than $75,000 in damages. If we felt that the complaint was inadequate on this, on these points, on complete diversity, and on the amount in controversy, do you believe you would be able to replead this if you were given that opportunity, and you would be able to satisfy the requirements for diversity jurisdiction? Absolutely. And, in fact, we had to certify to the court when we filed, to the district court, we had to check off a box that the amount of damages was in excess of $75,000. Right. But that's not in your pleading. So that's the problem with jurisdiction. We gauged jurisdiction by the pleadings, and you didn't allege citizenship. You only alleged residence, which is not the same. And you didn't allege the amount in controversy that's required. Now, I have fair confidence you could amend, but jurisdiction is jurisdiction. And, of course, you've read our recent case where the language is about the same as yours, and our panel, in a binding opinion, a binding on us, reversed. And I stand corrected on that. I didn't actually think that was going to come up as an issue. Right. I mean, they didn't raise it, so I get that. But I was, it's a concern, and so that's why we issued the order, to make sure you had an ample opportunity to think about it before getting here. And it's true, we did allege residency and not citizenship. I do realize those can be different things. And it doesn't allege that the damages are expected to exceed $1 million. They're not, we don't have them quantified to the dollar, but we can certainly amend or complain to make it clear that we are talking about more than $75,000. So would you, just for my interest, what's your damage theory? And if you were to put a number on the board today, what number would that be? So the damages are the difference between the return that he should have realized on the annuities, between the time he purchased them and the time they were sold, and the, what actually was realized. Now, there is an issue that shortly before one of them was sold or a couple of them were sold, they were transferred to the trust. But he had less to transfer to the trust because of the lack of growth. And to the extent, because we realized that there might be some confusion or overlap, the trust has signed its claims regarding those particular three annuities to John Marshall. So as far as those three annuities go, they were owned by John Marshall, they were purchased by John Marshall, the suitability decision was with respect to John Marshall. We've done a rough calculation as to what those accounts would have returned over that time frame. If they'd been invested into market investments, we ran some different rough portfolios, and we estimate to be over a million dollars. Thank you. As far as the substance of what we were here about, which is the motion to compel arbitration, I think the panel already probably understands what our argument is going to be on the evidentiary hearing. They waived it. It's that simple. They didn't ask for one. Right, but we don't need one if the evidence doesn't even rise to the level of showing that this would fall within, really, the exception for under California law for when you don't, you're not expected to read a contract. I mean, the presumption is that you do, you are expected to read one. And so you're trying to fit this case into some of the exceptions that have been recognized. And so I'd like to hear your view on why you think you meet those. Sure. And there's two reasons. One is the fiduciary relationship. And then you add on to that the fact that he's dyslexic. You don't actually need the dyslexia to meet that standard. Because if you've got a fiduciary relationship, that is an exception under California law that's well recognized. I know that that's right. I mean, I think that the cases talk about people who have certain vulnerabilities for certain specific situations. I don't think the California law says that fiduciaries always have a duty to inform the other side about an arbitration clause. It's expected that you would read the contract, usually. Well, I think that it's expected when you're not in a fiduciary relationship. There are cases outside of the arbitration context which hold that you don't have constructive knowledge of what's in documents that you receive but might not read because you are entitled to trust on your fiduciary. In the arbitration context, starting with the Ashman case, the six people who were my clients, because it is my case, none of them had any difficulty reading. They were middle-aged people. They weren't blind. They weren't infirm. They weren't dyslexic. But the Court still held that if the fiduciary relationship had arisen, which is what the evidence suggested, then there would be an obligation to explain the material terms of the contract, including the arbitration provision. Wasn't there a question in that case as to whether they even provided with it at all? Well, that was the second. There were two issues. I mean, actually, we had three issues, but one's not addressed in the opinion. So the first was the issue whether they even received them, and that was disputed. And then there was the issue of whether if they had received them, whether the — because of the fiduciary relationship, they would have been obligated to read them. They were two separate — you know, two separate points that the Court made, two separate holdings within the same case. So multiple issues, but the same reasoning. And then if you look at the Lynch case, Mr. Lynch was a multimillionaire. Sure, he had a ninth-grade education, but there was no evidence that he was illiterate, and it was a trust on the broker. And then you have this case where you also have a vulnerability because Mr. Marshall, undisputed, is dyslexic. I mean, that was what he stated. He explained that it was — reading is exhausting. He's not saying he's unable to read. If you give him enough time, he can read something, but it's difficult, especially when it's — But there's not an allegation that he wasn't given enough time, right? I mean, he's come forward and said, I have difficulty reading, and he's attached to that a document from many decades ago, I guess when he was in college. And in the time since, he's been a successful business person who has a pretty significant net worth. Right. And you can be a successful business person and still have difficulty reading. Right. But your opponent argues difficulty does not mean impossibility. And the argument is — you just heard it — that he says it takes me a long time, therefore, I rely on others. That seems to me a bit different from someone who can't comprehend a document at all. Right. And we're not saying it's the same. Absolutely not. Yeah. So tell me, do you — why do you think the difference is — why do you think there's no difference? Well, what I think the difference is here is that Mr. Marshall, in his unrebutted declaration, said, I specifically said to Mr. Ghazanfari, you know, I trust you. I'm to read. I'm dyslexic. Can you let me know if there's something important in here? And Mr. Ghazanfari accepted that responsibility and said, no, these are just formalities. You don't need to worry about it. There's nothing — you know, it's just so that I can manage your account. That's the key difference. If Mr. Marshall had kept silent about his dyslexia or if Mr. Ghazanfari had said, you know what, you really need to read this. I can't help you with that, we'd be — it'd be a different situation. But the situation we have here is you have the combination of all these factors in what, as the district court stated, makes this case fairly unique and certainly unique to any case I've had, where you have the 20-year relationship, the dyslexia, which makes it hard for Mr. Marshall to read. And I can tell you, you know, I've had him as a client for a while, and it takes him a very long time to read things. I'm not going to say it's impossible, especially when it's densely worded and packed in like these agreements. And you have him specifically asking Mr. Ghazanfari to let him know if there's anything important, and Mr. Ghazanfari specifically accepting that responsibility. I mean, is there — is there authority that you're aware of that says if someone's capable of reading something, they can essentially shift that duty to somebody else by just telling them, I'm putting that on you? Well, I think what the case law suggests is that if you've got a fiduciary relationship of trust and reliance, then the fiduciary does have the duty to explain the material terms of the contract. And those are not my words. Those are — that's an exact quote from the Ashburn case. And that's also the facts that were in Lynch, where they said, you know, they had a relationship of trust and reliance upon their advisor, and the advisor told them the agreements were just formalities. And because of that relationship of trust and reliance, they could trust and rely upon them. And so those cases are authority. Now, there isn't, you know, 20 cases on this, because this is a pretty unique situation, but you do have several published cases, at least three of them, which hold specifically that in a relationship of trust and reliance, the fiduciary does have the duty to explain the material terms, because you're not dealing at arm's length. What do we make of the fact that Ashburn remanded for an evidentiary hearing? I know your position is that it was waived here, and I understand that, but, I mean, it sort of shows some of the complexities that can be associated with some of these things. So in Ashburn, there were direct conflicts. There was a declaration from the broker and from the firm that said, I gave them the arbitration agreements. And then there were declarations from my clients, I've never seen these arbitration agreements, I never saw these arbitration agreements. That's about as direct as a conflict as you can get. And there was conflicting evidence on whether they'd formed a fiduciary relationship. Well, I didn't really advise them about anything. No, she did advise me about things. So when you have directly conflicting evidence, you need that. But here — Right. Well, and that is a problem whenever you have somebody who's deceased. And I don't mean to make light of that. I've had clients who were deceased where I'm representing a trust, and the opponent says they said X, Y, Z, and I can't rebut it. It's the unfortunate reality that people who passed on aren't here to testify. There might be notes in the file. But the reality is, if you had an evidentiary hearing, Mr. Marshall isn't going to go up there and say, no, I'm not really dyslexic. No, I didn't really trust Mr. Ghazanfari. No, I didn't really ask him. I mean, his testimony has to be credited as being credible. It was unrebutted. And there was no indication by Ameriprise in the trial court to the contrary. I mean, none of these issues were actually disputed when we were litigating this in the court below. So I appreciate your questions. I'm looking to see if there's anything that we didn't cover. I think, again, I would just reiterate that there is a longstanding, you know, California case law that in a fiduciary relationship, you are entitled to trust and rely upon that fiduciary. You're not talking about the shoe salesperson at Nordstrom or the doctrine of caveat emptor. And so you have a 20-year relationship of trust and reliance, and you have a specific request of the fiduciary, and the fiduciary agreeing to that request, which is an undertaking of that responsibility. So in a different factual scenario, if Mr. Marshall had not asked Mr. Ghazanfari to let me know if there's something important, then we might be talking about a different outcome. But you have that factual scenario. You have him undertaking that responsibility. And so for those reasons, we believe that the decision was correctly decided under California law and that there's — should not be remanded on that point. Thank you, counsel. Thank you. You've got a couple of minutes, counsel. Thank you, Your Honors. I'll just be making two points briefly on rebuttal. First, Ms. Stewart is inflating the holding of Ashburn, and I just want to highlight for the Court that the holding in that case does not indicate whatsoever that a fiduciary relationship de facto creates an obligation for an advisor to go over material terms of a contract. In fact, if you go — the final page of the decision makes clear that if the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of the contract between them, then failure to read the contract would be reasonable. What we're looking at here is whether or not there is a requirement under that relationship. And the requirement, based on the holdings of both Brown, Lynch, and even Ashburn, is either whether or not there was a vulnerable adult or, alternatively, whether or not there was an opportunity to actually discover the terms of the contract. So your friend on the other side says, well, we — you know, Mr. Marshall told Mr. Gonsanfare that he was relying on him for this. So what's your response to that? Well, my response to that, number one, Your Honor, is that we needed to have an opportunity to actually cross-examine Mr. Marshall about those representations. And, two, the scope of the fiduciary duty also requires that the fiduciary accepts those additional responsibilities upon him. And there's absolutely nothing in the record, nothing in the declaration, indicating that Mr. Gonsanfare whatsoever agreed to read over all of these contracts with him. Well, sure there is. There is a declaration of Mr. Marshall. There's a declaration of Mr. Marshall, but nothing in the agreement says that — No, no. I understand that. But, I mean, I'm looking at what the trial court was looking at, and he had a declaration that basically satisfied the argument you're making, and nothing on the other side. And you're just saying we needed to cross without any evidence that, to the contrary. The declaration states, Your Honor, that Mr. Gonsan — Mr. Marshall made repeated representations that he had a difficulty reading, and that he would trust that Mr. Gonsanfare would read to him. And in response, Mr. Gonsanfare allegedly said, yes, I have your best interests at heart, but there is nothing within that declaration indicating that Mr. Gonsanfare said, yes, if there is something that is material within this contract, I agree that I am going to read it to you. In fact, we should have had an opportunity, presumably, if this relationship stretched over a 20-year period of time, we should have had an opportunity to cross-examine Mr. Marshall and say, well, presumably, when you purchased other securities, there would have been very in-depth contracts that you had to review, including the — But here's my issue with you, which is — or your argument, I should say. We probably have the power to remand for an evidentiary hearing, but you're complaining about the district court's action when you didn't ask for it. And that's awfully hard to say. The district court, you erred in denying a motion that was never made. Understood, Your Honor. I think, going back to the record, the transcript from the motion itself is really telling, because within that transcript, we bring up the issue that we did not have the ability to cross-examine. We bring up the issue that there is a lack of evidence here because we have a deceased broker. Unlike the Ashburn case handled by my colleague, Ms. Stewart, in that case, there was a lot of conflicting evidence because there was an ability to submit conflicting evidence. We did not have that ability. And we — Well, and that's what the district court said. You don't have the ability to submit conflicting evidence because you have a deceased broker. I have to decide with the declarations I have.  And we believe that's where the district court erred. It should have said super sante right there that an evidentiary hearing is necessary. I understand your argument, and you're over time. Yes. Thank you. Thank you very much, counsel. Thank you. Both sides of the argument. This morning, the matter is submitted.
judges: THOMAS, NGUYEN, BRESS